UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------X

FURONG HU and ZHUOXUAN YE,                          Civ No.: 1:25-cv-02033

            Plaintiffs,

        -against-                                   **COMPLAINT AND**
                                    **DEMAND FOR JURY TRIAL**

GLOCK, INC., and GLOCK GES.M.B.H.,

            Defendants.
------------------------------------------------------X

        Plaintiffs, **FURONG HU** and **ZHUOXUAN YE**, by and through their attorneys, MATTHEW J. SALIMBENE, P.C., complaining of Defendants, GLOCK, INC., and GLOCK GES.M.B.H., (hereinafter "Defendants"), respectfully alleges as follows, upon information and belief:

1.      This firm, Matthew J. Salimbene, P.C., represent Plaintiffs FURONG HU and ZHUOXUAN YE (hereinafter "Plaintiffs") in connection with their claims for relief against Defendants GLOCK, INC., and GLOCK GES.M.B.H., (collectively "Defendants") for damages suffered by Plaintiffs during a April 2022 Subway Attack as a direct and proximate result of Defendants' conduct in connection with the marketing, and/or sale of a subject Glock pistol.

2.      Upon information and belief, Defendants, GLOCK, INC., and GLOCK GES.M.B.H. are engaged in the business of designing, manufacturing, assembling, distributing, and selling firearms, including the subject firearm that caused injuries to Plaintiffs FURONG HU and ZHUOXUAN YE.[1]

3.      Upon information and belief, reports of assaults and other major felonies occurring on the subway system increased significantly during the COVID-19 pandemic in New York City, when the number was adjusted for weekday ridership numbers. According to police statistics, crime in the subway has increased 68% from 2022 compared to the same time in 2021.

4.      Upon information and belief, before the April 2022 Subway Attack, there had been several high-profile incidents of violence in the subway, including the killing of Michelle

---

[1] Many of the allegations in this Complaint were originally alleged in Steur v. Glock, Inc., 1:22-cv-03192, (E.D.N.Y.)'s Complaint, which arises from the same transaction and occurrence.

Go in January and several stabbing cases.

5.    On the morning of April 12, 2022, a mass shooting was committed on a northbound N train on the New York City Subway in Sunset Park, Brooklyn, New York, United States. At approximately 8:24 a.m. EDT, a man reported to be 62-year-old black nationalist Frank Robert James put on a gas mask, threw two smoke grenades, and opened fire with a Glock 17 9 mm handgun bearing serial number KBR155 (hereinafter "Glock firearm") as the train approached the 36th Street station. He fired at least 33 shots, fled the scene after the attack and as a result of direct gunfire, injured the Plaintiff, FURONG HU while he was on his way to school, and Plaintiff, ZHUOXUAN YE while he was also on his way to school. The shooting occurred as the train was traveling between the 59th Street and 36th Street stations.

6.    Twenty-nine people were injured, ten of them from direct gunfire, including Plaintiffs FURONG HU and ZHUOXUAN YE; the remaining injuries were from smoke inhalation and being trampled.

7.    On the day after the attack, Frank James was arrested as the suspect after a large manhunt. James was charged by the U.S. Attorney's Office for the Eastern District of New York with committing a terrorist act on a mass transit system.

8.    Defendants, through their marketing practices in the manufacture, distribution, and sale of guns, including the subject Glock firearm, have contributed to creating and maintaining a public nuisance in the State of New York and have endangered the public health and safety in the following manner:

 a.    Marketing that emphasizes firearm characteristics such as their high capacity and ease of concealment, that appeal to prospective purchasers with criminal intent, including but not limited to through advertisement, product placement in movies and rap music;

 b.    Purposely supplying more firearms than the legitimate market could bear in order to induce sales in the secondary market;

 c.    Not training dealers to avoid straw sales and other illegal transactions; and

 d.    Refusing to terminate contracts with distributors who sold to dealers with disproportionately high volumes of guns traced to crime scenes.

 e.    Failing to have Glock removed from song lyrics, movies, television series and

              video games.

    f.   Failing to stop the glorification of Glock ownership and use through media and celebrity endorsements.

    g.   In successfully burying news articles, stories and documentaries that criticized or publicized Glock's history and marketing.

9.     Upon information and belief, Defendants, as makers and sellers of the subject Glock firearm, have, like all Americans, become aware that mass shootings become a frightening yet predictable part of modern life.

10.    Upon information and belief, Defendants know that, as a consequence selling Glock firearms to the civilian market, individuals unfit to operate these weapons gain access to them.

11.    Upon information and belief, Defendants are aware that their Glock design which promotes concealment and firearm's firepower, unsuited to personal defense or recreation, enables an individual in possession of the weapon to inflict unparalleled civilian carnage.

12.    Upon information and belief, despite that knowledge, Defendants continued and continues to market and distribute the Glock firearm to the civilian market.

13.    Upon information and belief, in order to continue profiting from the sale of Glock firearms, including the subject Glock firearm, Defendants chose to disregard the unreasonable risks of the Glock firearm in its marketing strategies.

**THE PARTIES**

14.    On or about the 12th day of April 2022, and at all times hereinafter mentioned, Plaintiffs, FURONG HU and ZHUOXUAN YE, were residents of the County of Kings, State of New York.

15.    Upon information and belief, Defendant GLOCK, INC., is a Georgia corporation with its principal place of business located at 6000 Highlands Parkway, Smyrna, Georgia 30082. Defendant GLOCK, INC., is the operating entity for the assembly, manufacturing, sale, and distribution of Glock pistols in the United States of America.

16.    Upon information and belief, at all times hereinafter mentioned, Defendant GLOCK, INC., is a gun manufacturer and importer within the meaning of all applicable statutes.

17.    Upon information and belief, at all times hereinafter mentioned, Defendant GLOCK,

INC., manufactures, markets, promotes, imports, distributes, and sells guns, including the subject .9 mm Glock 17 Firearm bearing serial number KBR155 involved herein.

18. Upon information and belief, at all times hereinafter mentioned, Defendant GLOCK GES.M.B.H., is an Austrian corporation, which trades and does business regularly within the United States of America and in the State of New York. That the Defendant's principal place of business is in Deutsch-Wagram, Austria. Defendant GLOCK GES.M.B.H., is the "parent company" of Defendant GLOCK, INC.

19. Upon information and belief, at all times hereinafter mentioned, Defendant GLOCK GES.M.B.H., having representatives in the United States of America, to wit, GLOCK, INC., as its designated and named business agent and distributor for Glock Pistols, including the hereinafter described Glock pistol which caused damages and injuries to Plaintiffs within the State of New York, and, as such, may be served with process pursuant to federal law and statute at its duly authorized, designated and named agent and distributor for its products throughout the United States, GLOCK, INC. Accordingly, service upon GLOCK GES.M.B.H., may be made by delivering service to its alter ego, GLOCK, INC. at its corporate office and address.

20. Upon information and belief, at all times hereinafter mentioned, Defendant GLOCK GES.M.B.H., is a gun manufacturer and importer within the meaning of all applicable statutes.

21. Upon information and belief, at all times hereinafter mentioned, Defendant GLOCK GES.M.B.H. manufactures, markets, promotes, imports, distributes, and sells guns, including the subject .9 mm Glock 17 Firearm bearing serial number KBR155 involved herein.

22. That the Plaintiffs' cause of action and claims for relief arise from the injuries occurring within the State of New York; the injuries were caused by actions either in the State of New York or by an act or omission outside of the State of New York; that each of Defendants regularly did and solicited business and/or engaged in other persistent courses of conduct within the State of New York; that each of Defendants derived substantial revenues from goods and/or services consumed and/or used in the State of New York and that each of Defendants did place in the stream of commerce in the United States and in the State of New York firearms and/or accessories or after-market parts which are the

subject of this litigation.

23.    Upon information and belief, Defendants are qualified gun industry members within the meaning N.Y. General Business Law 898–a to 898–e ("898").

**JURISCITION AND VENUE**

24.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. 1332 as the Plaintiffs are residents of the State of New York and Defendants are all citizens and/or residents of places outside of the State of New York and that the amount in controversy exceeds $75,000.00 exclusive of interest and costs.

25.    This Court has personal jurisdiction over all Defendants as Defendants are manufacturers and distributors of the subject Glock firearm that caused injury and damage in New York and Defendants, at the time of placing their parts into the stream of commerce, could have foreseen, realized, expected and/or anticipated that the product might eventually be found in New York by reason of its nature and Defendants' manufacturers' marketing practices.

26.    Venue is proper within the Eastern District of New York because the incident that caused injury which is the subject matter of this complaint occurred in Kings County and damages as a result of the subject matter of this Complaint occurred in Kings County, City and State of New York.


**N.Y. GEN.BUS.LAW 898 - AN ACT TO FIGHT GUN VIOLENCE WITHIN NEW YORK**

27.    On July 6, 2021, former Governor Andrew Cuomo signed General Business Law § 898 into law. See N.Y. Gen. Bus. Law 898.

28.    This legislation "[r]elates to the dangers to the safety and health of the public caused by the sale, manufacturing, importing, and marketing of firearms and whether such activity constitutes a public nuisance." L. 2021, ch. 237. *Id*.

29.    As the Legislature stated, the "purpose" of the law is as follows: "To regulate the sale, manufacture, importation, and marketing of firearms in relation to creating or maintaining a condition that endangers safety or health through the sale, manufacturing, importing, or marketing of firearms within the guidelines of *City of New York v. Beretta USA Corp.*, 524 F3d 384 (2d Cir. 2008)." L. 2021, ch. 237.

30.    The "Legislative findings and intent" underpinning the statute explain that the effects of

gun violence constitute a "public health crisis of gun violence in this state." L. 2021, ch. 237. The Legislature further found "that given the ease at which legal firearms flow into the illegal market, and given the specific harm illegal firearm violence causes certain New Yorkers, those responsible for the illegal or unreasonable sale, manufacture, distribution, importing or marketing of firearms may be held liable for the public nuisance caused by such activities. Id. Additionally, many New Yorkers, including many children, are gravely injured, or killed unintentionally due to the firearm industry's failure to implement reasonable safety measures and the legislature finds that this failure also warrants liability." *Id.*

31.     Section 898 defines several terms, including "deceptive acts or practices," "reasonable controls and procedures," "false advertising," "gun industry member," the terms "knowingly" and "recklessly," and "qualified product." N.Y. Gen. Bus. Law 898-a(1)–(6).

32.     Section 898-b then details the "prohibited activities" in this way:

   a.   No gun industry member, by conduct either unlawful in itself or unreasonable under all the circumstances shall knowingly or recklessly create, maintain or contribute to a condition in New York state that endangers the safety or health of the public through the sale, manufacturing, importing or marketing of a qualified product.

   b.   All gun industry members who manufacture, market, import or offer for wholesale or retail sale any qualified product in New York state shall establish and utilize reasonable controls and procedures to prevent its qualified products from being possessed, used, marketed or sold unlawfully in New York state. N.Y. Gen. Bus. Law 898-b(1)–(2). *Id.*

33.     Section 898 declares that a violation of the new article that results in harm to the public is a "public nuisance" where such conduct is unlawful and unreasonable (see N.Y. Gen. Bus. Law 898-c(1)–(2)), further provides for enforcement by the Attorney General in the name of the people of New York State, or by any city corporation counsel acting on behalf of the locality (see N.Y. Gen. Bus. Law 898-d), and it also provides for a private right of action by any person, firm, corporation, or association that has been damaged as a result of a gun industry member's acts or omissions (see N.Y. Gen. Bus. Law 898-e).

34.    On or about May 25, 2022, U.S. District Judge Mae D'Agostino of the Northern District of New York dismissed a lawsuit from gun industry groups challenging N.Y. Gen. Bus. Law 898, rejecting the arguments that the challengers had made that the state law violated the US Constitution. Specifically, U.S. District Judge Mae D'Agostino held that the New York law did not preempt a 2005 federal law limiting the liability gun manufacturers and dealers can face. Judge D'Agostino also held the New York law fit within an exception laid out in the federal statute. The judge also dismissed the claims that the New York law violated the Commerce Clause for discriminating against in-state competitors, as well as the gun industry groups' arguments that the law was unconstitutionally regulating conduct happening outside of the state. She additionally rejected arguments that the law was written in an impermissibly vague way.[2] *See National Shooting Sports Foundation, Inc. et al. v. Letitia James, in her official capacity, 1:21-Cv-01348- MAD-CFH.*

## FRANK JAMES

35.    Upon information and belief, Frank Robert James was born in 1959 in New York and spent years drifting from city to city.

36.    Upon information and belief, James had been arrested on 12 previous occasions, mostly for misdemeanors. He was arrested nine times in New York from 1992 to 1998, with charges including possession of burglary tools, criminal sex act, and criminal tampering.

37.    James was arrested three times in New Jersey, the earliest in 1991 and the most recent in 2007; in the mid-1990s, he was charged with making terroristic threats, but was convicted of the lesser charge of harassment and sentenced to probation and counseling.

38.    Upon information and belief, James had no felony convictions and purchased his Glock 9mm handgun (hereinafter "Glock Firearm") in 2011 from a pawn shop in Columbus, Ohio.

39.    Upon information and belief, videos posted over a series of years on YouTube and Facebook accounts, James often posted angry and hate-filled rants, including those containing homophobia, misogyny and racist comments targeted at Whites, Blacks, and Hispanics. He posted antisemitic diatribes, expressed grievances at persons he believed had wronged him, made violent threats, and invoked mass shootings.

---

[2] https://www.cnn.com/2022/05/25/politics/new-york-civil-liability-law-ruling/index.html

40.    Upon information and belief, in a video he published in the weeks before the subway shooting, James claimed to have a severe post-traumatic stress disorder.

41.    Upon information and belief, James had posted, "O black Jesus, please kill all the whiteys" on social media.

42.    Upon information and belief, in a video called "Forced Equality", James "obsessed over new Supreme Court Justice Ketanji Brown Jackson's marriage to a white man." In another, he railed about a White woman whom he appeared to know personally. "I would kill you, but it's not worth the time in jail," he said. "Killing you would be like killing a cockroach. You're not even a human being to me."

43.    Upon information and belief, James' beliefs have been linked to black nationalism, and he has been outspoken in his criticisms toward mayor Eric Adams and New York City's mental health services in several YouTube videos.

44.    Upon information and belief, James implied that a "race war" was imminent and said that "White people and Black people should not have any contact with each other." James characterized the situation of African Americans as an "American Auschwitz" and said that "the seed is already planted for a Nazi Party to rise in this country again and I believe it will."

**APRIL 12, 2022 ("The 2022 Brooklyn Subway Attack")**

45.    Upon information and belief, at around 6:15 a.m. EDT on April 12, 2022, video surveillance captured footage of a man matching James' description, who left a U-Haul van two blocks from a train station on the same subway line where the attack took place.

46.    Upon information and belief, on or about April 12, 2022, Plaintiffs were on a northbound N train on their way to work.

47.    Upon information and belief, at or around 8:24 a.m., Plaintiffs, and multiple other individuals, were shot on the northbound N train on the New York City Subway in Sunset Park, Brooklyn by Frank James by gunshots from a Glock firearm. After the train left the 59th Street station on the Fourth Avenue Line, Frank James put on a gas mask, threw two smoke grenades onto the floor of a train car, and opened fire with a Glock 17 9 mm handgun manufactured by Defendants as the train approached the 36th Street station. He fired at least 33 shots and fled the scene after the attack.

48.    Plaintiffs, FURONG HU and ZHUOXUAN YE, were shot by Frank James with the

aforementioned subject Glock firearm manufactured by Defendants.

49.   That solely and directly as a result of the negligence of Defendants, Plaintiffs, FURONG HU and ZHUOXUAN YE, sustained serious and permanent personal injuries.

50.   That by reason of the foregoing, Plaintiffs, FURONG HU and ZHUOXUAN YE, were caused to sustain serious injuries and to have suffered pain, shock and mental anguish; that these injuries and their effects will be permanent; and as a result of said injuries Plaintiffs have been caused to incur, and will continue to incur, expenses for medical care and attention; and as a further result, Plaintiffs were, and will continue to be, rendered unable to perform Plaintiffs' normal activities and duties and have sustained a resultant loss therefrom.

51.   Upon information and belief, when the train stopped at 36th Street, the police were called to the station at 8:30 a.m.

52.   Upon information and belief, a passenger waiting for the subway claimed that he saw "calamity" when the subway door opened due to the smoke, blood, and screaming.

53.   Upon information and belief, an announcement by the conductor on the R train across the platform urged riders on the northbound platform to board that train. When the train arrived at the 25th Street station, it stayed put, and police officers instructed riders to leave the station. In response, many riders began running for the exits in a panic, injuring more people.

54.   Upon information and belief, the New York City Fire Department (FDNY) arrived at the 36th Street station, initially responding to reports of smoke in the station.

55.   Upon information and belief, the suspect—who was described as a heavy-built black male, 5 feet 5 inches (1.65 m) tall and 175 to 180 pounds (79 to 82 kg), wearing a gas mask, MTA uniform, a gray hooded sweatshirt, a green vest and a backpack—fled the scene through another subway train and was not immediately apprehended.

56.   Upon information and belief, according to charging documents in federal court, surveillance footage showed James exiting the subway system at the 25th Street station, one stop away from the shooting.

57.   Upon information and belief, upon reports that the suspect may have fled onto the subway tracks, NYPD officers searched the tunnels. Law enforcement believes that the attacker acted alone.

58.    Upon information and belief, a U-Haul van used by the suspected gunman and rented in Philadelphia was found eight hours after the attack, about five blocks away from the Kings Highway station of the Sea Beach Line (served by the N train), where police reported the suspect entered the subway system.

59.    Upon information and belief, investigators were able to identify the suspect after finding a key at the crime scene, linking it to the credit card that was used to rent the van.

60.    Upon information and belief, a jacket discarded by James on the 36th Street station platform had a receipt from a storage facility in Philadelphia in it, where he rented an apartment in the weeks before the attack.

61.    Upon information and belief, searches of the storage facility and apartment found handgun ammunition, a taser, a high-capacity magazine for rifles, and a smoke canister.

62.    Upon information and belief, at or around 7:20 p.m. on the day of the attack, James, then age 62, was named by the NYPD as a person of interest. James was believed to be the renter of the U-Haul van.

63.    Upon information and belief, on the day after the attack, he was named as a suspect.

64.    Upon information and belief, authorities sent out an emergency alert with photos of James and a tip line; the rare use of the alert system (which was also used during the manhunt for the 2016 Chelsea bomber) distributed James' name and face with every New Yorker with a smartphone.

65.    Upon information and belief, during the manhunt, authorities appealed to the public to provide mobile phone videos from the shooting or any other information that could locate the suspect.

66.    Upon information and belief, the day after the attack, James called the tip line, said he knew he was wanted and that he was at a McDonald's at Sixth Street and First Avenue in the East Village neighborhood of Lower Manhattan.

67.    Upon information and belief, officers responding to the McDonald's did not find James, but after driving around the area, found him near St. Marks Place and First Avenue and arrested him at about 1:45 p.m. ET. The manhunt lasted 29 hours. Dozens of people contacted the NYPD with tips about James' whereabouts, and many took credit for his apprehension.

68.    Upon information and belief, James was charged by the U.S. Attorney's Office for the

Eastern District of New York with committing a terrorist act on a mass transit system, potentially facing a maximum of life in prison.

**Glock Firearm Used in the 2022 Brooklyn Subway Attack**

69. Upon information and belief, after the attack, it was revealed that Frank James, purchased the 9 mm Glock handgun that he used during the attack at a pawn shop, a licensed firearms dealer, in Columbus, Ohio, in 2011, a law enforcement source told Fox News.

70. Upon information and belief, according to New York Special Agent in Charge John DeVito, "the timeline of this gun spans 15 years and five states…Frank James purchased that firearm from a federal firearms licensee in Ohio in 2011."

71.



The subject Glock firearm used by James in the 2022 Brooklyn Subway Attack[3]

**DEFENDANTS' HISTORY AND NEGLIGENT MARKETING AND DISTRIBUTION MARKETING TACTICS[4]**

72. Upon information and belief, in or around February 1980, the Austrian army was looking to replace antiquated, World War II–era Walther P-38 handguns with something new. *Id*.

73. Upon information and belief, Gaston Glock, an Austrian citizen who ran a small business producing field knives and blades for the Austrian Army, overheard a conversation

---

[3] https://www.nydailynews.com/new-york/nyc-crime/ny-brooklyn-subway-shooting-suspect-manhunt-20220413-pmi73ln3xfhj7m54bute5cbcke-story.html
[4] Many of the factual allegations regarding Defendants' history and marketing tactics have been derived from: Barrett, Paul. Glock: The Rise of America's Gun. New York, New York. Crown Publishing Group, a division of Random House, Inc., New York, in 2012.

between two Austrian Army colonels and learned the Army was in the process of searching for a new pistol. *Id*.

74. According to Glock: The Rise of America's Gun, Glock asked the minister of defense whether or not his shop could compete, and the answer was, "Yes, why not?" *Id*.

75. Upon information and belief, "Glock knew nothing about handguns. He had spent two or three days in World War II as a conscript teenager in the Wehrmacht, but that had had no practical benefit for him. The machine shop owner went out and purchased a number of competing pistols, including the Italian Beretta 92F, the Swiss-German Sig Sauer P220, the Czech CZ75 and a modern version of the Walther P-38, the P-1. Glock took the weapons home and studied them, how they worked and how they were constructed. He also consulted firearms specialists, soliciting them for ideas on what they would like to see in a modern handgun." *Id*.

76. Upon information and belief, "Glock learned that the Austrian army wanted a pistol with a high ammunition capacity, more than the eight rounds of the Walther P-38. It should weigh no more than twenty-eight ounces, with a streamlined design and a consistent, light trigger pull. It should also have no more than forty parts. After a year of tinkering and product development, Glock filed for a patent for a pistol design on April 30, 1981. He delivered four test pistols the Austrian army on May 19, 1982. The resulting pistol, known as the Glock 17, swept the army's handgun trials and was accepted for service, earning Glock a contract for twenty thousand of his new pistols." *Id*.

77. Upon information and belief, "the Glock 17 was a pistol unlike any other. Strong and light, the lower half of the pistol is a polymer frame housing a steel fire control group. The upper half of the pistol is made from a single block of steel. This use of plastics allowed Glock to keep the handgun's weight down to twenty-three ounces—a quarter pound less than the army requirement. Other competitors such as the Beretta 92F and the CZ75 used a steel frame. Glock simplified the design to just thirty-four parts. Longtime gun manufacturer Beretta's 92F pistol, by comparison, had more than seventy parts. Glock spent considerable time working on his pistol's "pointability," a term that describes a pistol's natural ability to act as an extension of the shooter's hand and eye coordination. This makes the pistol easy to aim, translating into a more user-friendly, accurate weapon. The Walther P-38, by comparison "points badly." Glock also concentrated on making his

weapon reliable over all else, and in a competition that allowed for twenty jams in ten thousand shots, his pistol only failed once." *Id*.

78.     Upon information and belief, "the Glock 17 was also one of the first high-capacity pistols. The Browning Hi Power, designed by John M. Browning himself, was one of the first high-capacity shooters and carried thirteen rounds. The Beretta 92 could carry an impressive fifteen rounds. The Glock 17, however, beat the competition, packing seventeen rounds of nine-millimeter parabellum ammunition, more than doubling the P-38's magazine capacity."

79.     Upon information and belief, "Glock 17 handguns are used by the British Armed Forces, the Swedish Armed Forces, Indian special forces, the Iraqi military, the Israeli Defense Forces and the Yemeni military and hundreds of police forces worldwide." *Id*.

80.     Upon information and belief, "the original Glock 17, the model adopted by the Austrian army, contained only 36 parts, and could hold 17 bullets in its magazine. It didn't have an external safety like other semiautomatic handguns. It also didn't have a decocking mechanism." *Id*.

81.     Upon information and belief, since 1986, Defendants have been engaged in the business of assembling, marketing, and selling firearms in the United States.

82.     Upon information and belief, most of Defendant Glock Inc.'s pistol sales are made of independent distributors, who are contractually licensed by Defendant Glock Inc. to resell its pistols.

83.     Upon information and belief, in or around 1986, a gun battle erupted between federal agents and criminals Michael Platt and William Matix. The two were responsible for a spree of bank and armored car robberies in the south Florida region. Eight FBI agents, on the lookout for a car stolen by the pair, attempted to pull them over and a gunfight between the two sides ensued. Although outnumbering the criminals four to one, the FBI agents found themselves facing superior firepower with inferior weapons. The FBI agents were armed with a single Remington 870 shotgun, and .38 Special, nine-millimeter, and .357 magnum handguns. Platt and Matix were armed with a Ruger Mini-14 semi-automatic rifle and shotgun.

84.     Upon information and belief, "in or around 1988, the Glock made its way to the United States, coinciding with the rise of the American drug trade, when many cops were feeling

outmanned by gangs on the street."[5]

85.    "Law enforcement agencies had concluded that their agents and officers, armed with standard six-round revolvers, were getting "outgunned" by drug dealers with semi-automatic pistols; they needed a new gun. With its lightweight plastic frame and large-capacity spring-action magazine, the Glock was the gun of the future. You could drop it underwater, toss it from a helicopter, or leave it out in the snow, and it would still fire. It was reliable, accurate, lightweight, and cheaper to produce than Smith and Wesson's revolver." *Id.*

86.    Upon information and belief, Glock's large capacity and light body gave it advantages over other guns.

87.    Upon information and belief, according to Paul Barrett, the author of a book called "Glock: The Rise of America's Gun," "Police departments were amazed when they took their officers out to the range and found out not only could they learn to use the Glock pretty quickly, but the Glock also made them more accurate as marksmen," he says. "And that's in part because it has a very light, very steady trigger pull. ... Critics of the guns say the trigger pull is so light that it makes accidental discharges so likely. But the Glock always has had that dual nature to it — the advantages can be reframed as disadvantages." *Id.*

88.    Upon information and belief, "the early advantage for police departments, says Barrett, was that Glock gave them large discounts when purchasing the gun for their departments." *Id.*

89.    "This was smart, because the point was to get the police departments to adopt the gun, and that would give the gun credibility in the much larger, much more lucrative civilian market, where you can charge full price and get your full profit margin," says Barrett. "So this was... a very crafty strategy." *Id.*

90.    Upon information and belief, Karl Walter, a renowned gun salesman, discovered the Glock 17 in the 1980s and became the American marketer of the Glock pistol.

91.    Upon information and belief, "on selling the Glock to U.S. law enforcement "[Glock] was smart enough to hire a genius salesman. ... This man Karl Walter was really a guru in figuring out how to appeal to the police — whether that meant offering them extremely

---

[5] https://www.npr.org/2012/01/24/145640473/how-the-glock-became-americas-weapon-of-choice

attractive financial terms or hosting police procurement officers at [a famous strip club] in Atlanta. This was a guy who could make a deal with anybody and figure out how to sell the Glock." *Id*.

92.　Upon information and belief, "Karl Walter retained an Atlanta advertising firm called Indelible Inc. to generate stark, simply worded display ads, mostly for gun magazines. "Set your sights on the handgun of the future. It's here…" declared one early ad. "The Glock 17 'Safe Action' 9mm semi-automatic pistol… unprecedented performance and reliability. Revolutionary concept and design. Unsurpassed shooting comfort and durability."[6]

93.　Upon information and belief, "in or around 1988, Glock Inc. had moved to larger quarters in Smyrna, Georgia in an expanded facility." *Id*.

94.　Upon information and belief, "the regional wholesalers that distributed Glocks and the independent sales agencies that visited retail gun shops on behalf of the company were required to send personnel to Smyrna for a four-day course on the use and maintenance of the unusual handgun."

95.　Upon information and belief, "Karl Walter hosted dinners followed by visits to the Gold Club, a well-known Atlanta strip club." *Id*.

96.　Upon information and belief, "Thursdays became known as "Glock Night" at the Gold Club. "For a lot of guys coming in from out of town, this was the best time they were going to have all year, or maybe in their entire life… You go to Smyrna, get laid at the best strip club in town, drink champagne, you're not going to forget the experience when it comes time to choose between Glock and Smith & Wesson," said one former police official." *Id*.

97.　Upon information and belief, "in the late summer of 1989, Karl Walter convened a meeting for more than fifty independent regional sales representatives and their managers. At the meeting, Walter gave the group a special assignment for their night out at the Gold Club: "What I thought was we should pick the best-looking, the best candidate, among the three hundred girls, to promote the product at the Shooting, Hunting, Outdoor Trade (SHOT) Show." *Id*.

---

[6] Barrett, Paul. Glock: The Rise of America's Gun. New York, New York. Crown Publishing Group, a division of Random House, Inc., New York, in 2012.

98.  On selling guns using beautiful women at trade shows "It's extremely similar to the way cars are sold, by means of sex and models and lots of other products. In the same way you have models at trade shows of all sorts, you certainly have them at gun trade shows. The appeal is just as obvious as it might seem. Guns are to some people an expression of virility. ... A buxom, scantily clad woman appeals to some customers." On current efforts to strengthen gun control "No new federal gun control legislation was passed in the wake of [Columbine and other school shootings], which is in some ways more remarkable that in the wake of Virginia Tech and in the wake of Tucson, we have similarly seen no new efforts to restrict the legal sale or ownership of guns. In fact, it's quite to the contrary."[7]

99.  Upon information and belief, "in an article in Soldier of Fortune magazine touting the Glock's body, which was made out of plastic "[The writer] said, 'I was skeptical, too. I went over to Austria. I tried this gun. People, you've got to try it, too.' This was a huge door-opener for Glock. The focus on plastic soon developed into a controversy that was also a selling point because the gun control advocates [said], 'Because the gun is plastic, it'll become a terrorist tool. You'll be able to sneak it into airports, past the metal detectors.' This created a genuine controversy. … Suddenly people were talking about the Glock before there were even more than a handful of guns in this country. This kind of attention is priceless. ... And then it turned out that the allegations weren't true, that you could see a Glock on an airport X-ray machine because a big piece of industrial-shaped plastic shaped like a gun looks like a gun." *Id*.

100. In or around August 1999, a self-proclaimed racist Buford Furrow used a Glock pistol to shoot up a Jewish Center injuring several and later used it to kill a Los Angeles postal worker.

101. According to an article, this "illustrates the deadly consequences of the Austrian gun company's hyper-aggressive marketing to U.S. police, according to the Violence Policy Center. The Model 26, 9mm semiautomatic "pocket rocket" was sold first to the Cosmopolis, Wash., police department, which resold it to a civilian dealer. "Glock is notorious for pushing its high-powered, high-capacity pistols on law enforcement agencies, " said VPC senior policy analyst Tom Diaz. "Unfortunately, some police departments dump their old guns on the civilian market, available to people like Furrow.

---

[7] https://www.npr.org/2012/01/24/145640473/how-the-glock-became-americas-weapon-of-choice

The tragedy is that many of Glock's police sales are unnecessary, really intended to stimulate buyers in the bigger civilian market."[8]

102. Upon information and belief, in or around 1995, Gaston Glock, the CEO of Glock Inc., stated to Advertising Age: "It was a conscious decision to go after the law enforcement market first. In marketing terms, we assumed that by pursuing the law enforcement market, we would receive the benefit of "after sales' in the commercial market." *Id.*

103. Upon information and belief, "In 1991, the first Glock shooting spree took place in Texas. Twenty people were killed. Hours after the shooting, members of Congress were debating whether guns like the Glock should be restricted."[9]

104. "It took awhile, but by 1994, a bill was passed — this is what we remember as the Assault Weapons Bill — and was signed into law by President Clinton," says Barrett. "It had a variety of restrictions. One of them was limiting the pistol magazine capacity to 10 rounds. The legislation, which expired in 2004, was initially seen as a terrible blow to the Glock. But the company quickly found a way to use the ban on high-capacity magazines to their advantage, he says. "Glock had seen this bill coming for years and had been running the factory nonstop — three shifts a day, seven days a week — building up the large-capacity firearms and the large-capacity magazines," he says. "When the law was enacted, it allowed for a loophole that grandfathered in pre-existing equipment before the ban went into effect. [And] Glock had this huge stockpile of the very equipment that many gun owners wanted to get because it was banned — and the value of that equipment skyrocketed." *Id.*

105. Upon information and belief, "Glock also encouraged police departments to trade in their old equipment for newer, higher-capacity weapons. The old equipment — which contained the higher-capacity magazines manufactured before the ban — was then sold on the used-gun market, and found its way to the streets." *Id.*

106. "Police departments were implicated in the proliferation of handguns all across the country," Barrett says, a fact that came to haunt the municipalities that, a decade later, tried suing the gun industry for flooding the streets with guns." *Id.*

107. "Glock's executives would pop up on television and say, 'Who are you accusing of

---

[8] https://vpc.org/press/press-release-archive/pocket-rocket-in-la-postal-killing-shows-gun-industry-excess-in-police-sales/
[9] https://www.npr.org/2012/01/24/145640473/how-the-glock-became-americas-weapon-of-choice

putting guns on the street? We've done business with the very business in the city that's suing us. It is their guns on the street." Glock's statements helped undercut those lawsuits, says Barrett. "This process of always finding the exceptions, finding ways around efforts to restrict the Glock became a trademark for the company," he says. "Right from the start, it helped the company, and it continue[s] on through its entire history." *Id.*

108.   Upon information and belief, Defendants then made efforts to persuade renowned gun instructors like Emmanuel Kapelsohn, among others—to become advocates and introduce police departments to the gun as part of their firearms training. *Id.*

109.   Upon information and belief, "by reaching out to these trainers directly, as well as by offering open-house seminars to federal, state, and municipal trainers in targeted regions, Glock built a loyal following among them and thus established itself solidly in the law enforcement market." *Id.*

**Glock used in Hollywood and Rap Music**

110.   Upon information and belief, Defendants made an intentional effort for their pistols to be used in movies and rap songs. "Gun manufacturers do not have to pay anybody to cast their products in movies or television shows," Barrett points out, but they do have to work with prop masters, those "super specialists in weaponry" who are "in a position to spread a brand in a way that very few individuals are." *Id.*

111.   Upon information and belief, in or around 1990, "the Glock began to appear in the hands of police officers in Law and Order and other police procedural shows. It was also used by Bruce Willis in the movie Die Hard 2. Willis' character even bragged about the advantages of using a Glock…"[He] introduced the gun as a character to people who don't know anything about guns," says Barrett. *Id.*

112.   Upon information and belief, the notoriety from the big screen carried over to the rap industry.

113.   "While virtually every other industry maneuvers to exploit hip-hop's commercial influence, gun manufacturers have been saved the work," Rodrigo Bascunan and Christain Pearce wrote in their rap history, *Enter the Babylon System: Unpacking Gun Culture from Samuel Colt to 50 Cent.* "Guns are a part of life, death, and status in the same neighborhoods that hip-hop grew up in. It only makes sense that firearm brands

would come to pervade rap music."[10]

114.    "The Glock was adopted early on by some of the biggest names — Tupac, Dr. Dre. As soon as it appeared here, they began to embrace it for its dark, futuristic side," he says. "The fact that it looked tough, [had a] large magazine capacity, and, not incidentally, the fact that it rhymed so well with words you might want to use in rap lyrics." *Id.*

115.    In their 1992 hit "Bitches Ain't Shit," Dr. Dre and Snoop Dogg sang: "As we groove down the block / See my girl's house, Dre, pass the Glock." *Id.*

116.    Upon information and belief, "this publicity helped the Glock, as did its frequent mention in rap lyrics because the gun represented manhood and brandished in response to street rivals and perceived challenges from the police." *Id.*

117.    Upon information and belief, "in the early 1990s, Tupac Shakur, featured Glock in "Soulja's Story" on his 1991 debut solo record, *2Pacalypse Now:* "I chose droppin' the cop, I got me a Glock," Shakur rapped, "and a Glock for the niggas on my block." *Id.*

118.    Upon information and belief, "the album sparked a national debate in 1992 when a Texas state trooper was killed by a teenager who allegedly listened to *2Pacalypse Now.*" *Id.*

119.    Upon information and belief, "in or around 1996, at the age of 25, Tupac was killed after he was shot four times by a drive-by shooting in Las Vegas. The handgun used to kill Tupac was a .40-caliber Glock." *Id.*

120.    In the 2006 rap song titled "What You Know" by T.I., the Glock is mentioned in the following verse: "Video or not, dog, we'll bust it 'til the Glock stop Drag you out that Bentley coupe and take it to the chop shop (Oh)."

121.    Upon information and belief, "song titles incorporated the Glock brand: "Mask and da Glock" by Three 6 Mafia, "Hand on the Glock" by Cypress Hill, "Ain't No Glock" by TRU." *Id.*

122.    Upon information and belief, "when American soldiers hauled Saddam Hussein from his underground hideout in 2003, the deposed Iraqi ruler came to the surface with a Glock." *Id.*

123.    Upon information and belief, "Seung-Hui Cho, who murdered thirty-two people at Virginia Tech in 2007, used a Glock." *Id.*

---

[10] Barrett, Paul. Glock: The Rise of America's Gun. New York, New York. Crown Publishing Group, a division of Random House, Inc., New York, in 2012.

124.   Upon information and belief, "Steven Kazmierczak when he shot twenty-one, killing five, at Northern Illinois University in 2008, used a Glock." *Id*.

125.   Upon information and belief, "New York Giants star wide receiver Plaxico Burress shot himself in the leg in 2009 with a Glock he had stuck in his waistband before heading to a Manhattan nightclub." *Id*.

126.   Upon information and belief, "Jared Lougner fired a Glock with a thirty-three-round magazine in his January 2011 attempt to assassinate Rep. Gabrielle Giffords in Tucson, Arizona, an attack that resulted in six dead and thirteen injured, including Giffords." Id.

127.   Upon information and belief, Glock was referenced on at least one occasion in the following Movies: Man on Fire (2004), End of Watch (2012), The Avengers (2012), Pain & Gain (2013), John Wick Chapter 1 (2014), Fist 2 Fist: Weapon of Choice (2018), Captain America: The Winter Soldier (2014), Avenger: Age of Ultron (2015), Captain America: Civil War (2016), Jack Reacher: Never Go Back (2016), John Wich Chapter 2 (2017), Ant-man and the Wasp (2018), Black Panther (2018), Project Gutenberg (2018), John Wick Chapter 3 (2019), Avengers: Endgame (2019), 6 Underground (2019), Fast & Furious Presents: Hobbs & Shaw (2019), Bad Boys for Life (2020), Birds of Prey (2020), Marvel: Black Widow (2021), The Falcon and the Winter Soldier (2021), Resident Evil: Welcome to Raccoon City (2021), Sentinelle (2021), Gunpowder Milkshake (2021), Wrath of Man (2021), The Suicide Squad (2021), No Time to Die (2021), The Batman (2022), The Gray Man (2022), Black Panther: Wakanda Forever (2022), Ambulance (2022), The Guardians of the Galaxy Holiday (2022), John Wick Chapter 4 (2023), Extraction 2 (2023), Secret Invasion (2023), Luther: The Fallen Sun (2023), The Killer (2023), One More Shot (2024) and Bad Boys: Ride or Die (2024).

128.   Upon information and belief, Glock was referenced on at least one occasion in the following TV Shows: The Sopranos (1999-2007), NCIS (2003-Present), Bosch (2014-present), The Rookie (2018-present), Love Death + Robots (2019), Reef Break (2019), Hawaii Five-O (2010-2020), The CW: Arrow (2012-2020), Big Sky (2020), Cowboy Bebop (2021), What if…? (2021), Hawkeye (2021), Turner & Hooch (2021), The Walking Dead (2010-2022), Westword (2016-2022), Reacher (2022), The Terminal List (2022), Narco-Saints (2022), Fear the Walking Dead (2015-2023), Riverdale (2017-2023), The Night Agent (2023-present), Lioness (2023-2024) and S.W.A.T.

(2017-2025).

129.    Upon information and belief, Glock was referenced on at least one occasion in the following Video Games: Grand Theft Auto: San Andreas (2004), Grand Theft Auto: Liberty City Stories (2005), Grand Theft Auto IV (2008), Call of Duty: Modern Warfare 2 (2009), Grand Theft Auto V (2013), Battlefield Hardline (2015), Phantom Forces (2015), Umbrella Corps (2016), Arizona Sunshine (2016), Caliber (2018), Krunker (2019), Control (2019), Receiver 2 (2020), Call of Duty: Black Ops Cold War (2020), Into the Radius VR (2020), Battlefield 2042 (2021), Sniper: Ghost Warrior Contracts 2 (2021), Call of Duty: Modern Warfare II (2022), S.T.A.L.K.E.R. GAMMA (2022), SCP: 5K (2022), Arizona Sunshine 2 (2023), Alan Wake 2 (2023) and Call of Duty: Modern Warfare III (2023).

130.    Upon information and belief, Glock was referenced on at least one occasion in the following Songs: The Notorious B.I.G. - Stop The Gunfight (1997), Lil Wayne - The Blues (2000), Snoop Dogg - Crip Hop (2001), Beenie Man - Bossman (2002), Jay-Z - Road Dawgs (2003), Ludacris - Eyebrows Down (2003), Schoolboy Q - Crazy (2011), Gucci Mane - I Ain't Even Gonna Lie (2013), Fetty Wap - 679 (2015), Chief Keef - Bouncin (2015), A Boogie Wit da Hoodie - Somebody (2019), Pop Smoke - Dior (2019), Denzel Curry - Curry (2019), The Game ft 21 Savage - The Code (2019), Lil Tecca - Ransom (2019), Lil Uzi Vert - Silly Watch (2020), Calboy - Put Em On A Shirt (2020), Lil Uzi Vert - Million Dollar Play (2020), 21 Savage ft Metro Boom - Glock in My Lap (2020), BIG30 ft. Offset - F*** The Opps 4L (2021), Lil Durk ft Pooh Shiesty (2021), Nicky Jam - La Glock (2022), NLE Choppa - Trap Phone (2022), Lil Uzi Vert - Glock In My Purse (2022), 2 Chainz - Godzilla (2023), Bad Bunny - Mr. October (2023), YG - Knocka (2024), Future - Crazy Clientele (2024) and Polo G - G63 (2024).

131.    Upon information and belief, Defendants took no action after New York General Business Law §898 was enacted to curb the use of Glock in movies, television, video games and song lyrics.

132.    Upon information and belief, Defendants took no action after New York General Business Law §898 to change their marketing and distribution practices.

**Defendants' Negligent Marketing and Distribution**

133.    Upon information and belief, Defendants intentionally produced more firearms than the

legitimate market demands with the intent of marketing their firearms to purchasers who buy guns on the secondary market.

134.    Upon information and belief, Defendants breached their legal duty to Plaintiffs through their knowing, intentional, reckless, and negligent conduct foreseeably and proximately causing injury, and emotional distress, and to Plaintiffs.

135.    Upon information and belief, that the subject Glock firearm used by James in the 2022 Subway Attack against Plaintiffs were marketed, distributed, imported, promoted, or sold by each of Defendants in the high-risk, crime-facilitating manner and circumstances described herein, including gun shows, kitchen table' dealers, pawn shops, multiple sales, straw purchases, faux collectors, and distributors, dealers and purchasers whose crime-trace records or other information Defendants knew or should have known identify them as high-risk.

136.    Upon information and belief, Defendants' practices knowingly facilitate easy access to their deadly products by people like James.

137.    Upon information and belief, Defendants target its firearms to law enforcement first to gain credibility and then use the enhanced value that comes with law enforcement use to increase gun sales in the civilian market.

138.    Additionally, upon information and belief, Defendants contend that Glock guns are safe and appropriate for use by well-trained elite offensive police forces, but are not appropriate for civilians or unskilled users.

139.    Upon information and belief, Defendants and its distributors encourage police departments to make trade-ins earlier than necessary or originally planned so that they can sell more firearms to the police and sell the former police guns at a mark-up on the civilian market.

140.    Upon information and belief, Defendants are aware that by over-saturating the market with guns, the guns will go to the secondary markets that serve purchasers with a criminal intent, such as James.

141.    Upon information and belief, the gun that James used to shoot Plaintiffs was purchased by James at a pawn shop in Ohio in 2011.

142.    Upon information and belief, Defendant Glock arranged for the sale of their guns to the police department and its subsequent sale to gun dealers to facilitate the creation of a

secondary gun market like pawn shops where persons who are purchasers who have injurious intent obtain their firearms.

143. Upon information and belief, Defendants produce, distribute, and sell more firearms than legal purchasers can buy, and that they all knowingly participate in and facilitate the secondary market where persons who are purchasers who have injurious intent obtain their firearms.

144. Upon information and belief, the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) is a law enforcement agency within the United States Department of Justice.

145. Upon information and belief, Defendants select and develop distribution channels they know regularly provide guns to purchasers with a criminal intent, such as James.

146. Upon information and belief, Defendants have been specifically so informed [by the ATF] in connection with [its] crime-gun trac[ing] efforts[.]

147. Upon information and belief, despite this knowledge and information documenting the path of guns to criminal purchasers, Defendants fail to exercise reasonable care to protect the public from the risks created by the distribution and marketing schemes that create a secondary market.

148. Upon information and belief, Defendants' contracts with their distributors and dealers do not include provisions to address the risks associated with prohibited purchasers with a criminal intent, such as James.

149. Upon information and belief, Defendants gain significant revenue from the secondary gun market and therefore fail to adopt the most basic policies and practices that would help to greatly decrease the number of guns reaching prohibited purchasers with a criminal intent, such as James.

150. Upon information and belief, Defendants create and control the distribution channels that provided James, a purchaser and user with a criminal intent, with the firearm he used to shoot and injure Plaintiffs, and to injure the other victims.

151. Upon information and belief, Defendants knew which distributors and dealers provided guns to purchasers with a criminal intent, such as James.

152. Upon information and belief, Defendants knew that their negligent conduct created an unreasonable risk of harm to people like the Plaintiffs and that the subsequent creation of a secondary gun market was a substantial factor contributing to the injuries the Plaintiffs

suffered.

153.  Upon information and belief, Defendants' marketing and distribution policies knowingly created and maintained an unreasonable interference with rights common to the general public, constituting a public nuisance under New York law.

154.  Upon information and belief, Defendants market, distribute, promote, and sell firearms, including the subject Glock firearm, a lethal product, with reckless disregard for human life and for the peace, tranquility, and economic well-being of the public.

155.  Upon information and belief, Defendants knowingly created, facilitated, and maintained an over-saturated firearms market that makes firearms easily available to anyone intent on crime, including James.

156.  Upon information and belief, the subject Glock firearm used in the 2022 Subway Shooting was marketed, distributed, imported, promoted, and sold by Defendants in the manner set out herein, which Defendants knew or should have known facilitates and encourages easy access by persons intent on murder, mayhem, terror, or other crimes, including purchasers such as James.

157.  Upon information and belief, Defendants' conduct has thereby created and contributed to a public nuisance by unreasonably interfering with public safety and health and undermining New York's gun and public nuisance laws, and it has resulted in the specific and particularized injuries suffered by Plaintiffs, and many others.

158.  Upon information and belief, although Defendants knew about precautions, they could have taken to decrease access by prohibited purchasers of their products, they knowingly established, supplied, and maintained an over-saturated firearms market that facilitates easy access for criminal purposes.

159.  Upon information and belief, Defendants' actions make the public, including Plaintiffs, vulnerable to crime and assault and their conduct constitutes a public nuisance because it significantly interferes with the public safety, health, or peace.

160.  Upon information and belief, this interference is not insubstantial or fleeting, but rather involves a disruption of public peace and order in that it adversely affects the fabric and viability of the entire community, and a substantial number of persons, within the meaning of New York General Business Law.

161.  Upon information and belief, Defendants continually engage in their reckless conduct

even though they are continually informed of the resulting substantial, permanent, and long-lasting harm and even as they receive daily notice from the ATF of the distribution channels, they use that are doing the most harm.

162.     Upon information and belief, Defendants have reason to know-and actually know of the disastrous, continuing, and long-lasting effects of their conduct on the public in the City and State of New York.

163.     Upon information and belief, Defendants' marketing and distribution strategy includes the purposeful oversupply of guns to police departments and the provision of unnecessary upgrades and free exchange of guns with police departments to create a supply of post-police guns that can be sold through unlicensed dealers without background checks to buyers at a profit.

164.     Upon information and belief, Defendants' allegedly target states like Ohio, where the gun laws are less strict than in New York, in order to increase sales to all buyers, including purchasers, who will take their guns into New York.

165.     Upon information and belief, the ATF has provided Glock with the names of the distributors who are responsible for the sales of guns that end up in the hands of criminals, but Glock has ignored the information and continues to supply these same distributors.

166.     Upon information and belief, it is reasonably foreseeable that this negligent behavior and distribution strategy will result in guns getting into the hands of people like James with a criminal intent on murder, mayhem, terror, or other crimes.

167.     Upon information and belief, it also is reasonably foreseeable that once these purchasers obtain the firearms, they will use them for criminal activity.

168.     Furthermore, the kind of harm suffered by Plaintiffs (serious gunshot wounds, and trauma from witnessing and experiencing gun violence) is the kind of harm that is reasonably foreseeable when a person who is likely to use them to shoot innocent victims is able to purchase a Glock Firearm as a result of Defendants' manufacturer's distribution system.

169.     Upon information and belief, the ATF provided Defendants detailed reports of the distributors, dealers, pawn shops, and gun shows that consistently supply the guns used in crimes.

170.     Upon information and belief, Defendants failed to utilize distribution techniques that

were commonly used by other businesses to avoid distribution to end users.

171.   Upon information and belief, Defendants negotiate contracts with distributors and dealers that do not include basic provisions to address the risk of acquisition of firearms by prohibited purchasers despite the fact that other forms of incentive provisions regularly were included in the contracts.

172.   Upon information and belief, Defendants also fail to utilize basic training instruction that would help dealers and distributors recognize straw buyers or avoid distribution to purchasers who have injurious intent to obtain their firearms.

173.   Upon information and belief, Defendants were and presently are in a position to prevent the harms alleged.

174.   Upon information and belief, Defendants knew which distributors sold guns that were later found to be used in crimes and that Glock's marketing and distribution system essentially targeted the pawn shops so that purchasers who have injurious intent obtain their firearms could buy their guns.

175.   Upon information and belief, Defendants were aware of which distribution channels were providing guns to purchasers who have injurious intent obtain their firearms and was in a position to use the information the ATF made available to it to modify its distribution practices or to offer training to its distributors that would help them identify straw purchasers and purchasers who would in turn sell to purchasers like James who have injurious intent obtain their firearms.

176.   Upon information and belief, Defendants have engaged in affirmative acts (i.e., creating an illegal, secondary firearms market) by failing to exercise adequate control over the distribution of their firearms.

177.   Upon information and belief, the method by which Defendants created this market, is by selling firearms without regard to the likelihood the firearms would be placed in the hands of purchasers, or others not permitted to use firearms in New York.

178.   Upon information and belief, Defendants' actions are ongoing and that Defendants have actual knowledge of the damaging impact of their distribution and marketing practices on the health, safety, and welfare of the New York public.

179.   Upon information and belief, the distribution scheme developed by gun manufacturers and distributors including Defendants have unreasonably interfered with various public

rights including the public health, safety, and peace.

180.   Upon information and belief, Defendants have sufficiently alleged that Glock's actions fostered a secondary market that foreseeably led to James gaining access to firearms that he later used to injure innocent people and cause terror.

181.   Upon information and belief, Defendants' continuing conduct has produced a permanent or long-lasting effect, and Defendants know or have reason to know that it has a significant effect upon the public right.

182.   Furthermore, upon information and belief, at all relevant times herein mentioned, Defendants select, market, and develop distribution channels that they know regularly provide guns to criminals.

183.   Upon information and belief, at all relevant times herein mentioned, Defendants derive significant revenues, amounting to a substantial portion of their total firearm revenues from the crime market. They utilize the fear generated by criminal uses of their products to promote and market more sales to law-abiding citizens for self-protection.

184.   Upon information and belief, at all relevant times herein mentioned, Defendants market their guns to get into the secondary market, a market that provides a high percentage of crime guns.

185.   Upon information and belief, at all relevant times herein mentioned, Defendants use a two-tier distribution system, selling their firearms to distributors who then sell them through dealers. Upon information and belief, at all relevant times herein mentioned, Defendants set the terms and conditions, including distribution policies and practices, of this distribution system.

186.   Upon information and belief, at all relevant times herein mentioned, Defendants have the power to modify the policies and practices of their distributors, to seek alternative distribution channels, or to establish their own.

187.   Upon information and belief, at all relevant times herein mentioned, Defendants are fully aware of the extent of the criminal misuse of firearms.

188.   Upon information and belief, at all relevant times herein mentioned, Defendants are also aware that the illicit market in firearms is not simply the result of stolen guns but is due to the seepage of guns into the illicit market from thousands of unsupervised but licensed dealers.

189.  Upon information and belief, at all relevant times herein mentioned, Defendants have actual knowledge and are specifically placed on notice of crime-prone distribution channels by the ATF.

190.  Upon information and belief, at all relevant times herein mentioned, Defendants include incentive provisions in their contracts with dealers and distributors, but do not include provisions that would discourage sales associated with an unreasonably high risk of dispersal to prohibited persons, such as multiple sales, sales to pawn shops, sales to straw purchasers, and sales at guns shows.

191.  Upon information and belief, at all relevant times herein mentioned, Defendants are not engaged in business practices designed to discourage multiple sales; rather, their practices facilitate such sales.

192.  Upon information and belief, at all relevant times herein mentioned, Defendants as manufacturers do not monitor or supervise their distributors or dealers, except in ways that are aimed at maximizing profits.

193.  Upon information and belief, at all relevant times herein mentioned, Defendants as manufacturers have written distribution agreements that provide for the right of termination, and occasionally they have terminated or warned distributors or dealers. However, a dangerous sales practice — such as one that would make guns easily available for potential criminal use — has not been the basis for termination and is not included in the terms of the agreements.

194.  Upon information and belief, at all relevant times herein mentioned, Defendants as manufacturers purposely avoid any connection to or "vertical integration" with the distributors and dealers that sell their products. They offer high volume monetary incentives and generally refuse to accept returns. They contractually attempt to shift all liability and responsibility for the harm done by their products.

195.  Upon information and belief, at all relevant times herein mentioned, Defendants as manufacturers do not use available computerized inventory and sales tracking systems that are commonly and inexpensively used throughout American industry to limit and screen customers.

196.  Upon information and belief, at all relevant times herein mentioned, Defendants as manufacturers have completely failed and refused to adopt any such limits or to engage in

even minimal monitoring or supervision of their distributors and dealers.

197.    Upon information and belief, at all relevant times herein mentioned, Defendants as manufacturers do not require that their dealers and retailers be trained or instructed:

    a.    to detect inappropriate purchasers;

    b.    to educate purchasers about the safe and proper use and storage of firearms, or to require any training or instruction;

    c.    to inquire about or investigate purchasers' level of knowledge or skill or purposes for buying firearms; or

    d.    to train purchasers who intend to carry a concealed firearm about the appropriate circumstances in which to pull it out and fire it.

198.    Upon information and belief, at all relevant times herein mentioned, Defendants design, produce, market, and advertise their products, such as the Glock model 17, with the illicit market for criminal use as their target.

199.    Upon information and belief, at all relevant times herein mentioned, Defendants have increased the production of particular firearms that are popular for use by criminals, including the subject Glock firearm used in this subject incident.

200.    Upon information and belief, at all relevant times herein mentioned, Defendants as manufacturers have sometimes designed and advertised particular features of their products that appeal to purchasers with criminal intent.

201.    Upon information and belief, at all relevant times herein mentioned, Defendants as manufacturers design their firearms with features that are concealed, attractive, useful, and not detrimental for criminal use in a burglary, robbery, street murder, or drive-by shooting.

202.    Upon information and belief, at all relevant times herein mentioned, Defendants target the police market first as a tactic to entice the civilian market, where firearms associated with use by law enforcement are in great demand and disproportionately traced to crime.

203.    Upon information and belief, at all relevant times herein mentioned, Defendants design its firearms without safety features for military and police use, then "over markets" them to civilians.

204.    Upon information and belief, at all relevant times herein mentioned, Defendants sell police departments premature and often unnecessary firearms upgrades so that they can

obtain the used guns for resale on the civilian market.

205.   Upon information and belief, at all relevant times herein mentioned, Defendants send some of the police trade-ins to its distributors.

206.   Upon information and belief, at all relevant times herein mentioned, the other police trade-ins are given back to the police officers or sold back to the officers at steep discounts and that [a] number of officers [have] then illegally resold the guns, becoming in effect unlicensed dealers.

207.   Upon information and belief, at all relevant times herein mentioned, the subject Glock firearm used by Frank James in the 2022 Subway Attack, the one used to injure Plaintiffs and others, was marketed, distributed, imported, promoted, or sold by each of Defendants in the high-risk, crime-facilitating manner and circumstances described herein, pawn shops, multiple sales, and distributors, dealers and purchasers whose ATF crime-trace records or other information Defendants knew or should have known identify them as high-risk.

208.   Upon information and belief, at all relevant times herein mentioned, Defendants' marketing practices knowingly facilitate easy access to their deadly products by people like James.

209.   Upon information and belief, at all relevant times herein mentioned, Defendants target its firearms to law enforcement first to gain credibility and then use the enhanced value that comes with law enforcement use to increase gun sales in the civilian market.

210.   Upon information and belief, at all relevant times herein mentioned, Defendants contend that Glock guns are safe and appropriate for use by well-trained elite offensive police forces, but are not appropriate for civilians or unskilled users.

211.   Upon information and belief, Defendants market, distribute, promote, and sell firearms, including the Subject Glock firearm, a lethal product, with reckless disregard for human life and for the peace, tranquility, and economic well-being of the public.

212.   Upon information and belief, Defendants' marketing and distribution practices made it far more likely that criminals, including Frank James, would obtain their weapons.

213.   Upon information and belief, Defendants refused to terminate contracts with distributors who sold to dealers with disproportionately high volumes of guns traced to crime scenes.

214.   Upon information and belief, Defendants engage in marketing that emphasizes

30

characteristics such as their high capacity and ease of concealment that appeal to prospective purchases with criminal intent, such as James.

215. Upon information and belief, Defendants have purposely supplied more forearms than the legitimate market could bear in order to induce sales in the secondary market.

216. Upon information and belief, Defendants have knowingly created, facilitated, and maintained an over-saturated firearms market that makes firearms easily available to anyone intent on crime.

217. Upon information and belief, Defendants purposefully marketed the subject Glock firearm to police with the intention of profiting both from the first-time purchase to police and the after-sales on the civilian or secondary market.

218. Upon information and belief, Gaston Glock confirmed this, by stating: "It was a conscious decision to go after the law enforcement market first. In marketing terms, we assumed that by pursuing the law enforcement market, we would receive the benefit of "after sales' in the commercial market."

219. Upon information and belief, at all relevant times herein mentioned, through the ATF, Defendants were aware of many crime guns were being traced back to its distributors.

220. Upon information and belief, at all relevant times herein mentioned, Defendants ignored this data and continued to supply its distributors and market the subject Glock firearm model regardless of how many criminals they were arming.

221. Upon information and belief, at all relevant times herein mentioned, Defendants also target and market to states where weak gun laws allowed them to maximize sales.

222. Upon information and belief, Defendants continually engage in their reckless conduct even though they are continually informed of the resulting substantial, permanent, and long-lasting harm and even as they receive daily notice from the ATF of the distribution channels, they use that are doing the most harm.

223. Upon information and belief, Defendants have reason to know -- and actually know of the disastrous, continuing, and long-lasting effects of their conduct on the public.

224. Upon information and belief, the aforementioned conduct by Defendants, which was either unlawful in itself or unreasonable under all the circumstances, knowingly or recklessly created, maintained, or contributed to a condition in New York state that endangers the safety or health of the public through the sale, manufacturing, importing, or

marketing of the subject Glock firearm.

225.  Upon information and belief, that Defendants failed to establish and utilize reasonable controls and procedures to prevent its qualified products from being possessed, used, marketed, or sold unlawfully in New York state.

226.  Upon information and belief, Defendants could have, through means within their control, helped prevent firearms they manufacture, market, distribute, and sell from flowing into the illegitimate market and into the hands of unauthorized and irresponsible persons, thereby causing harm to the Plaintiffs.

227.  Upon information and belief, after the codification of NEW YORK GENERAL BUSINESS LAW § 898 (a-e), that Defendants failed to establish and utilize reasonable controls and procedures to prevent its products from being used, mentioned, marketed and or otherwise advertised in movies, television, music and video games.

228.  Upon information and belief, after the codification of NEW YORK GENERAL BUSINESS LAW § 898 (a-e), Defendants failure to  to establish and utilize reasonable controls and procedures to prevent its products from being used, mentioned, marketed and or otherwise advertised in movies, television, music and video games, benefited its marketing strategy by continuing to normalize the ownership and use of its products to carry out unlawful and harmful activities. .

229.  Upon information and belief, after the codification of NEW YORK GENERAL BUSINESS LAW § 898 (a-e), that Defendants knew, or should have known that the continued use, mentioning, highlighting, marketing and or advertising of its products through movies, television, music and video games was a constant reminder to individual Glock owners and James that the product they possess is readily available to carry out unlawful and harmful activities; that it is acceptable to carry out those unlawful and harmful activities; and that it is the weapon of choice to carry out those unlawful and harmful activities.

230.  Upon information and belief Defendants possessed the means and it was within their control to help prevent the firearms they manufacture, market, distribute, and sell from flowing into the illegitimate market and into the hands of unauthorized and irresponsible persons, thereby causing harm to the Plaintiffs.

231.  Upon information and belief Defendants possessed the means and it was within their

control to help prevent the firearms they manufacture from being used in the media, including movies, television, video games and music.

232. Upon information and belief in 2018 the documentary "Weapon of Choice" was released in the United States, Canada and Australia.

233. Upon information and belief in 2018 the documentary "Weapon of Choice" story line was: "They never fail. The Glock pistol has been fetishised in films and the arts, and is a regular topseller in the international arms market. For the first time, the filmmaking duo Fritz Ofner and Eva Hausberger tell the story of the rise of the Glock: An Austrian design that became the most sought-after service and murder weapon worldwide. Tracing the web of power, money, violence and politics, the film masterfully portrays the dark sides of globalisation and not least an Austrian tale of willful ignorance." [11]

234. Upon information and belief "Weapon of Choice" is not available to view or purchase in the United States, Canada or Australia.

235. Upon information and belief Defendants used their means and control to limit, stifle and otherwise suppress the "Weapon of Choice" movie from being available to the public.

**FIRST CLAIM OF RELIEF ON BEHALF OF PLAINTIFFS**
**VIOLATION OF THE NEW YORK GENERAL BUSINESS LAW § 898 (a-e)**
**(Brought against All Defendants)**

236. Plaintiffs repeats and incorporates by reference the allegations stated above as if they were set forth in full herein.

237. Upon information and belief, at all relevant times herein mentioned, Defendants, who are sued individually and jointly and severally, are the manufacturers, importers, marketers, distributors, and dealers of firearms used in the commission of crimes in New York.

238. Upon information and belief, Defendants, through their design, marketing, and distribution practices, have unlawfully and unreasonably knowingly created, supplied, maintained, and contributed to an illegitimate market for guns through which criminals, juveniles and other prohibited users obtain guns that are thereafter used in criminal activity in the City and State of New York.

239. Upon information and belief, at all relevant times herein mentioned, Defendants unlawfully and unreasonably produce, market, distribute and sell substantially more

---

[11] https://www.imdb.com/title/tt7683350/

firearms than they reasonably expect to be bought by law-abiding purchasers, and they knowingly participate in and facilitate the secondary market where persons who have injurious intent obtain their firearms.

240.   Upon information and belief, at all relevant times herein mentioned, it was foreseeable to Defendants that such an unlawful and unreasonable business and marketing practice would lead to easy access for criminal purposes, including easy access by persons intent on murder, mayhem, or other crimes, including purchasers such as James.

241.   Upon information and belief, the particular Glock Firearm used in the 2022 Brooklyn Subway Attack incident was unlawfully and unreasonably marketed, distributed, imported, promoted, and sold by Defendants in the manner set out herein, which Defendants knew or should have known facilitates and encourages easy access by persons intent on murder, mayhem, or other crimes, including purchasers such as James.

242.   Upon information and belief, Defendants' conduct has thereby created and contributed to a public nuisance in the City and State of New York by unlawfully and unreasonably interfering with public safety and health and undermining New York's General Business Law § 898 (a-e), and it has resulted in the specific and particularized injuries suffered by Plaintiffs.

243.   Upon information and belief, although Defendants knew about precautions, they could have taken to decrease access by prohibited purchasers of their products, they knowingly established, supplied, and maintained an over-saturated firearms market that facilitates easy access for criminal purposes, including easy access by persons intent on murder, mayhem, or other crimes, including purchasers such as James.

244.   Upon information and belief, Defendants could have taken, but have failed to take, reasonably available steps to restrict or impede the unlawful flow and use of firearms into the City and State of New York.

245.   Upon information and belief, Defendants' actions make the Plaintiffs and public vulnerable to crime and assault and their conduct creates a public nuisance within the meaning of New York's General Business Law § 898 (a-e).

246.   Upon information and belief, Defendants' conduct in the design, marketing and distribution of their guns has created, contributed to, and maintained the public nuisance of unlawful possession, transportation and disposition of guns and the utilization of guns

in the commission of an offense by:

    a. marketing that emphasizes firearm characteristics such as their high capacity and ease of concealment, that appeal to prospective purchasers with criminal intent, including but not limited to through advertisement, product placement in movies and rap music;

    b. Purposely supplying more firearms than the legitimate market could bear in order to induce sales in the secondary market;

    c. Not training dealers to avoid straw sales and other illegal transactions; and

    d. Refusing to terminate contracts with distributors who sold to dealers with disproportionately high volumes of guns traced to crime scenes.

    e. Failing to have Glock removed from song lyrics, movies, television series and video games.

    f. Failing to stop the glorification of Glock ownership and use through media and celebrity endorsements.

    g. In successfully burying news articles, stories and documentaries that criticized or publicized Glock's history and marketing.

247. Upon information and belief, as a result, Defendants' conduct unreasonably exposed Plaintiffs to a risk of harm.

248. Upon information and belief, Defendants market, distribute, promote, and sell their products with reckless disregard for human life and for the peace, tranquility, and economic well-being of the public.

249. Furthermore, upon information and belief, Defendants have created a firearms market that is oversaturated and their conduct have unreasonably interfered with public safety and health.

250. Upon information and belief, by their alleged actions, Defendants have caused the specific and particularized injuries to Plaintiffs and others.

251. Upon information and belief, Defendants' acts were the cause of the Plaintiffs's injuries.

252. Upon information and belief, although gun manufacturing is legal and the sale of guns is regulated by state and federal law, the distribution and marketing of guns in a way that creates and contributes to a danger to the public generally and to the Plaintiffs in particular is not permitted under law.

253.    Upon information and belief, although Defendants may assert that there is no connection between manufacturer and distributor and the underground market, it is not so. Defendants have successfully weaved a tangled web of deception whereby the connection between the manufacturer and the retailer is clouded, a web that because of its intricacies and complexity confuses liability so that liability is not imputed to the manufacturer, yet the outrageous profits derived from the illegal underground market continue to flow to Defendants.

254.    Upon information and belief, Defendants knew or should have known that their marketing, promotion, distribution, importation, and sale of firearms, by which the firearm used in the 2022 Brooklyn Subway Attack alleged here came to be in the possession of a person like James, would likely result in injuries of the type suffered by Plaintiffs.

255.    As a result of Defendants' unlawful conduct, Plaintiffs FURONG HU and ZHUOXUAN YE are entitled to monetary damages for their injuries and past and future pain and suffering, punitive damages, pre-and post-judgment interest, attorneys' fees and costs, and such other legal and equitable relief as this Court deems just and proper.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs prays and respectfully requests that the Court enter judgment in their favor and against Defendants, containing the following:

a.  A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the New York General Business Law §898 (a-e)

b.  Order Defendants to institute and carry out policies, practices, and programs which eradicate the effects of its past and present unlawful marketing and distribution practices;

c.  Issue an injunction restraining Defendants from continuing the tortious and wrongful conduct complained of herein;

d.  Order Defendants to make whole Plaintiffs FURONG HU and ZHUOXUAN YE and ZHUOXUAN YE, by providing compensation for past and future pecuniary losses resulting from the unlawful marketing and distribution practices described above, in amounts to be determined at trial;

e.  Order Defendants to make whole Plaintiffs FURONG HU and ZHUOXUAN YE, by providing compensation for non-pecuniary losses, including physical pain and suffering,

permanent physical injuries, emotional pain, suffering, mental anguish, embarrassment, and isolation, resulting from the unlawful marketing and distribution practices described above, in amounts to be determined at trial;

f.  Order Defendants to pay Plaintiffs FURONG HU and ZHUOXUAN YE, punitive damages for their malicious and reckless conduct described above;

g.  Attorney fees and costs; and

h.  Grant such further relief as the Court deems necessary and proper in the public interest.

**JURY DEMAND**

Plaintiffs hereby demand a trial by jury on all issues of fact and damages stated herein.

Dated: New York, New York
       April 8, 2025

Matthew J. Salimbene, P.C.

Matthew J. Salimbene, Esq.
*Attorneys for Plaintiffs*
420 Lexington Avenue, Suite 1402
New York, New York 10170
(212) 935-2060
mjs@salimbenelaw.com